## JACKSON et al. v. UNITED STATES.

### No. 5914.

Court of Appeals of the District of Columbia.

Argued June 8, 1933.

Decided June 26, 1933.

John H. Wilson, Samuel Levine, and J. Flipper Derricotte, all of Washington, D. C., for appellants.

Leo A. Rover, William H. Collins, and John J. Sirica, all of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, and VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

Appellants were indicted, tried, and convicted of murder in the first degree. Their motion for a new trial was denied by the lower court, and the case is here on appeal.

The killing occurred on the 7th of August, 1932, in one of the parks in the colored section of the city of Washington. The victim was a police officer. Earlier that evening he had arrested two colored boys for disorderly conduct, and they had been taken in a patrol wagon to jail. Jackson, one of appellants, was incensed because of these arrests and also because the policeman ordered him off the sidewalk when he protested. A little later in the evening Jackson suggested to several of his friends, including the other two appellants, that they should get together and attack the policeman, and accordingly, after fortifying themselves with whisky, they remained around the park until about midnight, when one of them, said by one of the witnesses to be Jackson, though he himself denied it, threw a rock at the policeman, causing the latter to leave his automobile and come back into the park to arrest the person who had thrown the rock. The officer, after a brief conversation with another colored man, walked up to Jackson and asked if he had thrown the rock. Jackson replied he had not. The policeman said that he knew he had, and thereupon placed him under arrest. The story of what followed is told by one of the government's witnesses as follows:

After placing Jackson under arrest, the officer carried him across the concrete to the other side of the park; the officer had Jackson by the belt, and Jackson said: "I am not going to stand for being locked up." When the officer persisted, Jackson said: "Come on, gang, get him." Whereupon the defendant Irvin Murray (another of the appellants) came from behind a bush and hit the officer in the back of the head with a brick, causing the officer to be knocked to the ground; Murray then reached down and took the officer's gun, and Holmes (another of the appellants) reached down and took his billy and hit the officer five or six times over the face and head, after which Jackson, Murray, and Holmes ran away.

Substantially the same account of the arrest of Jackson and the assault on the officer is told by other witnesses, and in its main parts was not denied by the defendants in their testimony. In the confessions they made to the police and which were read to the jury there is little if any variation.

In his confession Jackson stated he said to the officer when he undertook to arrest him: "You ain't going to take me nowhere unless it is over my dead body." "Not paying attention to that, he continued to pull me, and I was pushing him, cause I knew what would happen. We then go between a bush and a tree where Irvin Murray steals from behind it, and just as he turns his face towards Murray, Murray hits the police a powerful blow with a half-brick, which caused the officer to release me."

Murray in his confession, speaking of the time immediately after the arrest, said: "Just as the officer went to look around I threw the brick and struck the officer in the head with it. Joe Jackson then shoved the officer down. The officer moaned like and I ran in and grabbed the officer's gun out of the holster. Ralph Holmes grabbed the officer's stick and started beating him in the face with the stick."

Holmes, speaking to the same point of time, said: "The officer then grabbed Joe Jackson in the front of his shirt near the collar and raised his nightstick, but did not hit Joe. Joe also grabbed the officer. They was tusselling, and I said, 'Come on, boys; let's gang him.' The officer says to Joe, 'I'm going to lock you up.' Joe says, 'You're not going to lock me up, cause the only way you'll lock me up is if I am dead.' I saw 'Shorty' Murray go up behind the officer and hit him with something, and the officer fell to the ground. I went over and picked up the officer's nightstick and hit the officer with it five times, while he was on the ground, in the face, and once in the chest."

Jackson, in describing the events preliminary to the assault, stated that he gathered "the park bunch" and "plotted to get the police." Holmes said that all three appellants, together with a number of others, got together and determined to "gang" the policeman whenever he should come up and grab one of them. Murray said he was told of the plan to attack the policeman and was asked to join and agreed.

Among the witnesses for the government was Dr. Murphy, a physician and deputy coroner for the District of Columbia. He had performed the autopsy upon the body of the slain officer. His testimony was that deceased was 29 years of age, 5 feet 9 inches tall, and weighed 189 pounds; that after the assault he had a black eye, and a lacerated, ragged wound running from the bridge of the nose on the left side down to and into the left

angle of the mouth; also a lacerated wound of the right upper lip running from midline to the right, 2 inches long; that he had a lacerated wound of the right lower lip, running from midline three-quarters of an inch to the right; also a lacerated wound of the chin on the right side; that he had a comminuted fracture of the bridge of the nose, that is, a multiple or splintered fracture; that he had a fracture of the base of the skull, extending from the right temporal bone; and that his death was due to a fractured skull, with associated hemorrhage and shock.

Each of the appellants testified in his own behalf, but all that appears in the record is that they admitted having signed confessions but denied certain of the incriminating statements contained in them and insisted they had been previously beaten and abused by the police. These questions were fairly submitted to the jury without objection. The appellant Murray testified he did not know whether he had hit the officer on the back of the head with a brick, though he may have done so, that he was very drunk at the time and did not remember what he did.

The errors assigned on appeal are as follows:

First. The court erred in permitting the assistant prosecutor to comment upon the defendants' failure to produce bystanders to prove their innocence.

Second. The court erred in admitting Government Exhibit No. 4 without proper preliminary proof.

Third. The court erred in denying defendants' counsel the right to cross-examine Lieutenant Cox with reference to matters brought out on direct examination.

Fourth. The misconduct of the prosecuting attorney in referring to the statement of one Leroy Robinson.

Fifth. The misconduct of the prosecuting attorney in introducing certain testimony under a promise to connect up the same, without having any such connecting evidence at his disposal.

Sixth. The misconduct of the prosecuting attorney in bringing into court and leaving in sight of the jury a package of bricks and in failing to offer them in evidence.

Seventh. In admitting in evidence brass knucks found on Irvin Murray at the time of his arrest in Virginia.

Eighth and ninth. For error by the court in its instruction to the jury with relation to Jackson's right to resist an illegal arrest, and likewise in refusing to tell the jury that they should acquit Jackson in the event they were in doubt whether he had delivered a blow at the officer in the struggle.

We have read the entire record with painstaking care and have examined the brief of counsel for appellants with equal care. We are unable to find any error, either assigned or apparent, which would justify a reversal of the judgment of the court below.

The first assignment, as we have seen, is directed to the failure of the court to stop the remarks of counsel to the failure of appellants to call certain witnesses in their behalf. There is nothing in the record to enable us to determine what counsel said on this subject, and this itself is fatal to the assignment, nor is there anything in the record from which we can gather that appellants themselves denied the evidence of the assault given against them by the government witnesses, though it is stated in the brief that they denied they had conspired or agreed or arranged in advance to make the assault. If, therefore, the prosecuting attorney stated in his argument that an inference of guilt might be drawn from their failure to call as witnesses other bystanders, it would seem to us to have no relevancy and certainly could not have affected the issue in any way. When an accused is faced with evidence of guilt and is so situated that he can show by other evidence that the suspicious circumstances can be accounted for consistently with his innocence, and he fails to offer the proof, the natural conclusion is that the proof, if offered, would tend to support the charge. Graves v. United States, 150 U. S. 118, 121, 14 S. Ct. 40, 37 L. Ed. 1021. But we have no need to invoke that rule here. In the state of the record and also in view of the fact that so far as we can see the court's attention was not at the time called to any improper statement on the part of counsel, we are impelled to hold that there is nothing in the assignment.

Assignment No. 2 appears to be based on the fact that government counsel in examing the first two or three witnesses showed them certain photographs of the place where the assault is said to have occurred and asked them to mark certain places on the photographs, and this was done, but the photographs were not then nor were they afterwards offered in evidence. They were not shown to the jury, though they remained on the counsel table during the trial. When they were first offered for identification objection was made by counsel for the defendants to their admission in evidence on the

ground, apparently, that it was not shown when they were taken, and since this objection seems to have prevailed, we fail to see in what respect the fact that they were tendered to a witness for examination and marked by him could be said in any sense to be prejudicial to the accused.

The third assignment is to the refusal of the court to permit Police Lieutenant Cox, who was present when the confessions were obtained, to testify why he was present. The purpose of counsel is stated to have been to show, if permitted, that it was a rule in the department that a commissioned police officer should always be present on such occasions and that this rule grew out of certain investigations that had been made prior to the time in question with relation to methods of the police in obtaining confessions. Obviously the inquiry with relation to this subject was entirely beside the question before the jury and would have tended to confuse rather than aid in the determination of the question submitted to the jury. The police lieutenant did state he was present as a result of a regulation of his department. That was enough. The reason for the regulation was of no consequence.

The next assignment is the alleged misconduct of the prosecuting attorney in arguing to the jury "about the statement of Leroy Robinson which was not in evidence." The record shows that in his closing argument the prosecuting attorney referred to a statement of one Leroy Robinson, an original defendant, but against whom a verdict of not guilty had been directed by the court at the close of the government's case. Robinson, like appellants, had made a statement to the police. In it he denied any participation in the assault. The purpose of the prosecuting attorney, if we may indulge some inferences, was to call attention to the fact that Robinson's statement was not a confession of guilt, and hence to have the jury infer that appellants' statements on the witness stand that they had been maltreated by the police were untrue. But when objection was made to his using the statement for any purpose the court promptly sustained it. It is true the prosecuting attorney was needlessly argumentative in the colloquy between himself, the court, and counsel for appellants, but what he said was so disconnected and so without point that it is most unlikely the jury had any correct idea of his purpose in the reference. It goes without saying, of course, he should at once have obeyed the court's warning not to refer to the subject, but we think that any possi-bility of prejudice to appellants was removed by the court's statement to the jury that no inference prejudicial to appellants could be drawn from anything in Robinson's statement and that everything therein should be disregarded by the jury. The statement itself was not prejudicial to appellants. It had been read to the jury and was, as to Robinson, a complete denial of participation in the assault, and the jury had been told by the court it could be considered only as to Robinson. In the circumstances we would be going very far indeed to set aside the conviction on a ground as nebulous as this.

The next assignment is to the admission of the evidence of one Reginald Smith, who had testified that immediately preceding the assault and while Jackson was under arrest, he heard some one in the group surrounding the officer say: "Are you all going to let that cop take that man?" And also, "Let's get that cop." We need not consider whether this evidence was admissible or not, because, on motion of counsel for appellants, it was stricken from the record and the jury admonished not to regard it.

The next assignment is to the misconduct of the prosecuting attorney in allowing a package of bricks to remain on the table and not offering the bricks in evidence. It is needless to comment on this.

Assignment No. 7 is not pressed, and is without merit.

Assignments 8 and 9 relate to the alleged refusal of the court to instruct the jury with regard to the acquittal of Jackson in the event they were in doubt as to whether or not he delivered a blow. These assignments are based upon a request of counsel at the conclusion of the court's charge as follows: "Your Honor instructed that Jackson, in resisting arrest, if he did so, would be guilty of manslaughter, but Your Honor did not state the position if they should find that he did not deliver a blow or if they should be in doubt, that he should be acquitted." To this the court replied: "I do not think there should be any special request as to that." The court then said: "Are there any other requests?" Counsel replied: "No. I think Your Honor has covered it all." From this it is obvious that there was no exception taken to the action of the court in refusing to instruct in accordance with counsel's suggestion, but even if there had been we should not sustain the point for the reason that the court's charge to the jury appears abundantly to have protected every right the defend-

ant Jackson was entitled to in this respect. The instructions of the court contained indeed everything which any of the defendants had a right to ask. Jackson himself had stated that he provoked the difficulty and called on his "gang" to close in on the policeman and that this was prearranged. In these circumstances it would have been error if the court had instructed the jury he was guilty of no offense if he had not personally struck the officer in his struggle while under arrest or after the assault on the officer by the others of the gang. If the jury believed statements made by him to the police were voluntarily made, and this question the court submitted fairly to the jury without objection, there was no alternative than to convict him, as the jury did, of murder in the first degree. If the jury believed the statements should be disregarded as having been obtained by coercion, they still would have been obliged—if they believed the other government evidence—in finding him and his codefendants guilty of murder in the second degree. And, if, on the other hand, they had believed Jackson's evidence given by him on the witness stand, which we assume was a complete denial of any preagreement to make the assault or of any assault by him afterwards (though his evidence is not in the record), the jury would have been obliged under the instruction which the court *did give* to acquit him. The court's charge, to which there was no exception and which embraced all of the requests of appellants except that to which we have last referred, was as full and fair to appellants as they could ask.

The record as a whole discloses no error which we ought to notice farther than we have already done, and we are left, therefore, no alternative than to affirm the judgment of the court below.

Affirmed.